## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:14-CV-858-FL

| | |
|---|---|
| DAVID W. CARPENTER, JR., | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND
RECOMMENDATION**

This matter is before the court on the parties' cross-motions for judgment on the pleadings

[DE-24, DE-26] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant David

W. Carpenter, Jr. ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

seeking judicial review of the denial of his application for a period of disability and Disability

Insurance Benefits ("DIB"). Claimant filed a response to Defendant's motion [DE-28], and

Defendant filed a reply [DE-29]. The pending motions are now ripe for adjudication. Having

carefully reviewed the administrative record and the motions and memoranda submitted by the

parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied,

Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the

Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on October 12,

2011, alleging disability beginning December 31, 2004. (R. 71, 148-57). The claim was denied

initially and upon reconsideration. (R. 71, 53-67). A hearing before the Administrative Law Judge

("ALJ") was held on May 9, 2013, at which Claimant, who was represented by counsel, Claimant's son, and a vocational expert ("VE") appeared and testified. (R. 71, 17-52). At the hearing, Claimant amended his alleged onset date to September 10, 2010. (R. 21, 71). On June 3, 2013, the ALJ issued a decision denying Claimant's request for benefits. (R. 71-85). Claimant requested review of the ALJ's decision, and the Appeals Council denied Claimant's request on September 30, 2014. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial

evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ erred by (1) improperly weighing the opinion of

3

Claimant's treating mental health provider; (2) finding Claimant's mental impairments did not meet or equal, either individually or in combination, Listings 12.04 and 12.06; (3) failing to obtain a forensic psychological assessment; and (4) failing to sufficiently account for Claimant's limitations in concentration in the residual functional capacity ("RFC") determination. Pl.'s Mem. [DE-25] at 4-11.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found that Claimant had not engaged in substantial gainful employment since his alleged onset date of September 10, 2010. (R. 73). Next, the ALJ determined that Claimant had the severe impairments of obstructive airway dysfunction, bronchial hyperactivity, anxiety disorder, and depression. (R. 74). At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 74-76). Applying the special technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restriction of his activities of daily living, moderate difficulties in social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation of an extended duration. (R. 75).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the following limitations: avoidance of work areas with

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of (continued...)

4

concentrated amounts of respiratory irritants, such as dust, fumes, or smoke; due to depression and a resulting decrease in the ability to concentrate on and attend to work tasks, he is able to perform only simple, repetitive, routine tasks (i.e., can apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations), is unable to work at jobs requiring complex decision making, constant change, dealing with crisis situations, or requiring adherence to a production rate; and only occasional interaction with co-workers and supervisors and no public contact. (R. 76-79). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 78-79). At step four, the ALJ concluded that Claimant was unable to perform any past relevant work. (R. 79). However, at step five, the ALJ concluded there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 80-81).

## B. Claimant's Testimony at the Administrative Hearing

Claimant was 44 years old and married with three children, ages 16, 20, and 22, at the time of the administrative hearing. (R. 23). He graduated from high school and thereafter served in the Army as a general equipment operator for four years. (R. 24, 26). Claimant was stationed in Panama prior to and during the invasion, supporting a Marine unit where he "saw some serious combat," and later assisted with deployment for the first Gulf War. (R. 24-25). Claimant received an honorable

---

¹(...continued)

walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

discharge in 1991. (R. 26). He performed odd jobs while looking for work, and on October 15, 1995 he began his employment as a firefighter in New York. (R. 26). Claimant was working at a station in the South Bronx on September 11, 2001. (R. 27). He was a first responder to the attacks on the World Trad Center and witnessed the towers burning, people leaping out of windows, and the collapse of the towers. (R. 27-28). Claimant worked search and rescue at Ground Zero for the first 24 hours, and then continued to work at the site off and on for several weeks. (R. 29-30). He lost about 35 friends in the attack and has nightmares about what he witnessed. (R. 28-29). Claimant was required by the fire department to visit the counseling service unit, which was mandatory for all 9/11 firefighters, where he received information about issues he could expect to deal with, but he did not receive treatment. (R. 32-33). At that time he was experiencing difficulties, but was still working as a firefighter and so he did not understand the effects at that point. (R. 33). Claimant continued to work as a firefighter until sometime in 2002 when he began to suffer from breathing problems. (R. 30). He underwent pulmonary function testing and was placed on light duty for a year and a half, during which time further testing was conducted. (R. 30-31). Claimant was told his breathing problems were attributable to being exposed to the cloud of dust and debris when the towers collapsed. (R. 33). On December 22, 2004, it was determined by the fire department that Claimant was disabled and he separated from the fire department on December 31, 2004, thereafter receiving disability. (R. 31). Claimant has not worked since that time. *Id.*

In 2005, Claimant moved his family to North Carolina, where his parents lived, to get away, take a break, and get out of New York where there were constant reminders of 9/11. (R. 32). He enjoyed life in his new setting, meeting new friends and spending time with his parents, but his mental status was becoming progressively worse. (R. 34). Claimant made new friends, but they did

6

not replace the ones he had lost, which created animosity and problems building friendships. (R. 34-35). He also began experiencing problems with his family, such as yelling at his children over minor issues, and his wife told him to either "go or get help[.]" (R. 35). Claimant received little treatment from 2005-2010, because he thought he could handle his mental health issues internally, although he did see Dr. Meehan during that time. *Id.* He brought medications for his breathing problems with him from New York and did not think he needed to see a doctor. *Id.* In 2010, Claimant returned to New York and visited the World Trade Center site and several fire houses. (R. 36). He saw memorials to the fallen that brought up many emotions, and some of the firefighters he knew suggested he seek help. *Id.* Claimant was already scheduled for a physical with the fire department's doctor and filled out a questionnaire regarding his mental health to obtain a referral for treatment. *Id.*

After returning to North Carolina, Claimant sought treatment from Dr. Tobin for anxiety and depression. (R. 36-37). Dr. Tobin prescribed Zoloft, which Claimant continues to take daily. (R. 37). The medication makes Claimant more relaxed but drowsy and has not completely alleviated his symptoms, so he has some good days and other days when he will "blow-up." (R. 37, 41). In March 2012, Claimant contacted the New York fire department's counseling service unit requesting assistance and was referred to Kristen Krippa, a licensed psychological associate. (R. 38, 78). Claimant has scheduled appointments with Krippa weekly, but sometimes misses his appointments, because he does not want to get out of bed or deal with people. (R. 38). Claimant's post traumatic stress disorder ("PTSD") and depression primarily cause nightmares and anger issues as a result of being around people, and Krippa has given him some coping skills. *Id.* He also has difficulties with concentration and memory, such as missing appointments or forgetting to pay bills. (R. 39).

7

Most days Claimant stays home in his pajamas and watches television or reads a book, and at times he has to turn everything off and he sits and stares at the ceiling. (R. 39-40). When his wife asks him to do something, he tells her to have one of their sons do it. (R. 40). Claimant's wife does not drive so most of the time when he leaves the house it is to take her shopping. *Id.* Some days he does not want to be around people or has not slept the night before due to nightmares, which he has roughly three times a week. *Id.* Claimant's bad days are unpredictable and may be triggered by sleeplessness, certain dates or reminders, or his children or other people asking him questions. (R. 41). Claimant tries to avoid going out or being around people because they do not understand what he experienced and it is hard for him to explain. *Id.* Claimant played golf when he first moved to North Carolina in order to try and make friends, but he had not played in three years. (R. 39). He has tried to move forward and be productive but every time he tries to do something the events of 9/11 come into his mind, and although he looks fine on the outside, he is having trouble on the inside. (R. 42).

## C. Joshua Carpenter's Testimony at the Administrative Hearing

Claimant's 20-year-old son, Joshua Carpenter ("Joshua"), testified at the administrative hearing. (R. 43-47). Joshua sees his father every day and believes he is disabled mentally and physically. (R. 43). Claimant is unable to do physical labor around the house so Joshua does it, and he describes his father as mentally "not all there." (R. 44). For example, Claimant "gets real freaked out" being alone or going to big places like into the city, is fearful of planes, and has nightmares that cause sleeplessness. *Id.* Joshua explained that Claimant would be having a regular day and then something happens that makes him remember 9/11 and he becomes angry for a while, using alcohol to calm himself, but not as much as he used to. (R. 45). When Claimant is angry he does not scream

8

or yell, but Joshua can tell and tries not to do anything to push him over the edge. *Id.* Claimant has bad days on a weekly basis, but it varies, and this impacts the family in a negative way. (R. 45-46). Right after 9/11 Joshua was still young and could tell something was wrong with Claimant but did not understand what was wrong until he was older and believes Claimant's condition has been "steady" and not getting worse. (R. 46). Joshua believes Claimant would work if he could and that he still wants to be a firefighter or an EMS worker, because he likes helping people. (R. 47).

## D. Vocational Expert's Testimony at the Administrative Hearing

Maria Vargas testified as a VE at the administrative hearing. (R. 47-50). After the VE classified Claimant's past relevant work, the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant with the RFC to perform light work with the following limitations: unable to work in environments with concentrated respiratory irritants; limited to performing simple, routine and repetitive tasks, meaning the individual could apply common sense understanding to carry out instructions furnished in written, oral or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations; no more than occasional contact with coworkers and supervisors; no dealing with the public; and no complex decision making, constant change, or dealing with crisis situations. (R. 48-49). The VE opined that the hypothetical individual could not perform Claimant's past relevant work, but could perform the jobs of mail clerk, Dictionary of Occupational Titles ("DOT") code 209.687-026, light exertion level with an SVP of 2; small parts assembler, DOT code 706.684-022, light exertion level with an SVP of 2; and electronics worker, DOT code 726.687-010, light exertion level with an SVP of 2. (R. 49). Claimant's attorney then posed each of the following limitations in addition to those the ALJ posed to the VE: requires frequent unscheduled breaks

9

during the day; unable to maintain regular attendance; unable to manage routine stress associated with working; and unable to consistently get along with coworkers or supervisors. (R. 50). The VE indicated that there would be no jobs available to an individual with any one of these limitations. *Id.* The VE indicated her testimony was consistent with the DOT. (R. 49).

## V. DISCUSSION

### A. The ALJ's Consideration of the Opinion Evidence

Claimant contends the ALJ improperly weighed the opinion of his treating mental health provider Kristin Krippa, M.A., HSP-PA, a licensed psychological associate. Pl.'s Mem. [DE-25] at 4-8. Claimant specifically takes issue with statements made at the administrative hearing by the ALJ related to the fact that Krippa's treatment of Claimant was post-date last insured ("DLI"), that the ALJ cited no medical evidence contrary to Krippa's opinion, and the ALJ's reliance on Claimant's functional reports and daily activities to discount Krippa's opinion, and also argues that *Bird v. Comm'r of Social Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012) requires remand for consideration of the post-DLI evidence. *Id.*; Pl.'s Resp. [DE-28] at 3-8. Defendant contends the ALJ properly discounted Krippa's opinion as inconsistent with other substantial evidence in the record and that *Bird* does not require remand. Def.'s Mem. [DE-27] at 20-25; Def.'s Reply [DE-29] at 1-8.

The regulations require the ALJ to consider all evidence in the record when making a disability determination. 20 C.F.R. § 404.1520(a)(3). Regardless of the source, the ALJ must evaluate every medical opinion received. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). More weight is generally given to opinions of treating sources, who usually

10

are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

Further, according to the regulations, a psychological associate is not considered an acceptable medical source. *See* 20 C.F.R. § 404.1513(a) (defining "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (finding no error in determination that a psychological associate was not an acceptable source of medical evidence under the regulations). Even so, "evidence from other sources" may be used "to show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 404.1513(d); *see also* S.S.R. 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (explaining that opinions from "other [medical] sources . . . may provide insight into the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to function"). As other medical sources "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians," their opinions "are important and

11

should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. Thus, while opinions from other sources must be weighed and considered by the ALJ, they are not "acceptable medical sources" as defined in 20 C.F.R. § 404.1513(a) and cannot be afforded controlling weight. *Id.* at *2.

In May 2013, Krippa provided summaries of her treatment of Claimant in support of his disability application. (R. 448-62). Claimant began seeing Krippa in March 2012 for outpatient therapy to treat his PTSD, major depressive disorder, and alcohol abuse. (R. 448). Krippa indicated that after Claimant witnessed the traumatic events of 9/11 as a first responder, he developed symptoms including difficulty concentrating, short term memory problems, depression with past suicidal ideation, sleep disturbance, significant generalized and specific anxiety, anhedonia, and anger with periodic episodes of impulsive, angry verbal outbursts, which have significantly impacted his relationships with friends and acquaintances. *Id.* Krippa noted that over the course of Claimant's treatment he displayed significant difficulty, including following through with plans, some treatment recommendations, and participating in activities; completing projects at home and following up on telephone calls in a timely manner; periods of progress followed by periods of regression; and an inability to participate in therapy sessions or even complete routine daily tasks around his home. (R. 448-49). Krippa indicated that escalation in Claimant's PTSD symptoms are triggered frequently by references to 9/11, including reports of more recent violent events, anniversary dates, and several other events. (R. 449). Krippa opined that Claimant's symptoms will prevent him from meeting the minimal requirements of a full-time job, such as keeping a regular work schedule and managing the stress of a day-to-day work setting. *Id.* Krippa also stated that Claimant's explosive anger, although better controlled, remains a problem and would significantly impact his ability to function in the

12

workplace. *Id.* In another summary, Krippa suggests that during the 11 years between 9/11 and Claimant seeking treatment, his mental health problems were "brewing" and that "[b]y report it appears [Claimant] spent the majority of those years suffering from many symptoms of [PTSD] and was barely functioning on a day to day basis." (R. 456). In a letter to Claimant's attorney, Krippa indicates that "[Claimant's] removal from the fire department in 2004 appears to have exacerbated his symptom[s] and he appears to have been unable to function beyond barely meeting daily needs in the years between September 11, 2001 and his seeking treatment in 2010." (R. 461). Krippa suggests that it was "emotionally difficult" for Claimant to ask for help as a first responder and former service member. *Id.* Krippa also noted Claimant's report that he tried to take an EMT class in 2009 but had an anxiety attack during CPR training due to a flashback of a "bad baby experience" when he was a firefighter. (R. 462).

The ALJ correctly characterized Krippa's opinion as one from a non-acceptable medical source that "may be considered as to the severity of the impairment(s) and how they limit the claimant's ability to function." (R. 79). The ALJ acknowledged that Krippa's summary of Claimant's treatment indicated he had "problems stemming from posttraumatic stress disorder soon after his involvement in the September 11 events and cleanup." *Id.* However, the ALJ found that medical evidence in the record contemporary with Claimant's service as a firefighter documents only breathing problems associated with exposure to dust and smoke at the World Trade Center site. *Id.* The ALJ found that Claimant's recent treatment involved only counseling and that medications were prescribed to Claimant in 2010, but he did not follow up with care. *Id.* The ALJ also noted that the function reports filled out by Claimant and his father contradicted the picture of Claimant's functioning presented by Krippa. (R. 78). The ALJ determined there was no pre-DLI evidence

13

indicating that Claimant was precluded from all work, citing Claimant's self-reported activities of daily living, which included cooking and other household chores, shopping, being involved with his children, and visiting with others socially. (R. 79).

Claimant first takes issue with the ALJ's statements at the hearing regarding Krippa's opinions. Pl.'s Mem. [DE-25] at 5. Plaintiff argues that "[w]ithout even reviewing her reports, the ALJ made clear at the outset of the hearing that he was not inclined to give Ms. Krippa's opinions any weight due to the fact that she was not actively treating Mr. Carpenter during his period of insurability, which expired on June 30, 2011 (she started treating him nine months later in March 2012)." *Id.* To the extent Claimant contends the ALJ erroneously prejudged Krippa's opinions, the record does not support this contention. The ALJ commented that he would look at the evidence but could not say how much weight, if any, it would be given since the records were post-DLI. (R. 21-22). There was nothing erroneous about the ALJ's statement, where post-DLI evidence, as a general proposition, may or may not be relevant and must be considered on a case-by-case basis. *See Bird,* 699 F.3d at 341; *Moore v. Finch,* 418 F.2d 1224, 1226 (4th Cir. 1969). It is also worth noting that the ALJ had not reviewed Krippa's reports at the time of the hearing because he had yet to receive them. (R. 20). Claimant's counsel unsuccessfully attempted to submit Krippa's reports for the first time the day before the hearing, and the documents had to be resubmitted while the hearing was taking place. (R. 22). Moreover, the ALJ did not summarily dismiss Krippa's reports because they related to a post-DLI period, but rather he discounted them because he found them to inconsistent with other evidence of record. *See Wilkins v. Colvin,* No. 7:12-CV-324-FL, 2014 WL 1057384, at *8 (E.D.N.C. Mar. 17, 2014) (unpublished) (rejecting argument that ALJ's erroneous statement at the administrative hearing regarding the consideration of post-DLI evidence required remand where

14

the ALJ's written opinion indicated she considered medical evidence beyond Claimant's insured status and did not summarily reject such medical evidence just because it post-dated Claimant's DLI). Accordingly, the ALJ's comments provide no indication that he erroneously prejudged the evidence.

Claimant next points out that while Claimant's treatment relationship with Krippa did not begin until after Claimant's DLI, other acceptable medical sources diagnosed Claimant with anxiety and depressive disorders prior to his DLI and prescribed medication. Pl.'s Mem. [DE-25] at 6. Claimant takes issue with the ALJ's conclusion that medication was effective in controlling Claimant's symptoms when the record indicates only that his symptoms were improved, and with the ALJ's characterization of Claimant's anxiety and depression as "recently surfaced." *Id.* The ALJ does not dispute that Claimant had anxiety and depression, finding them to be severe impairments at step two. (R. 74). The ALJ also specifically noted Claimant's November and December 2010 office visits related to problems with irritability and impulse and anger control, that Claimant was started on anxiety medication, and that he reported "improvement in his mood and anger control with less irritability" at the December 2010 office visit. (R. 77). In discussing Krippa's opinion, the ALJ correctly noted that Claimant was prescribed medication in late 2010 and that he did not follow up with care. (R. 79). There is nothing unreasonable about the ALJ's inference that Claimant's medications were effective where Claimant sought treatment, was prescribed mediation, and sought no change of medication or further treatment from that provider, and his recent medical treatments focused only on counseling. (R. 74, 77, 79); *see Richardson v. Colvin*, No. 4:14-CV-00125-FL, 2015 WL 5725546, at \*6 (E.D.N.C. Aug. 11, 2015) (unpublished) (finding conservative treatment lends little support to claims of debilitating symptoms), *adopted by* 2015 WL 5737613 (E.D.N.C.

15

Sept. 30, 2015). Likewise, there is nothing erroneous about the ALJ's characterization of Claimant's anxiety and depression as "recently surfaced," given that Claimant first sought treatment for these conditions in September 2010, amending his onset date accordingly (R. 21), and there is no evidence in the record suggesting Claimant's anxiety and depression were debilitating prior to 2012.

Claimant also argues that the ALJ should have given more weight to Krippa's opinion that Claimant's mental impairments were disabling prior to his DLI based on her explanation that Claimant did not seek treatment earlier because it was "emotionally difficult" for Claimant to ask for help as a first responder and former service member. (R. 461). However, much of the Krippa's opinion is based on Claimant's self-reported history, which the ALJ correctly found was not borne out by the record including Claimant's own function report, and Krippa's opinion is not accompanied by her treatment notes or other objective clinical evidence. *See Wright v. Astrue*, No. 1:09CV0003, 2012 WL 182167, at \*7 (M.D.N.C. Jan. 23, 2012) (finding the ALJ properly accorded little weight to the opinion of a psychological associate where the opinion listed the claimant's self-reported symptoms rather than clinically-identified symptoms, the assessment included no test results or any other objective, clinical evidence of the claimant's abilities, and the ALJ was in no way obligated to accept an opinion on the ultimate issue of disability). For example, Krippa's summary states that "[d]uring the eleven (11) years that passed between the time of the terrorist attacks and [Claimant] seeking treatment, his mental health problems were brewing" and that "*[b]y report* it appears [Claimant] spent the majority of those years suffering from many symptoms of [PTSD] and was barely functioning on a day to day basis." (R. 456) (emphasis added). Yet, as the ALJ noted, Claimant continued working as a firefighter after 9/11 until he was determined to be disabled due to breathing problems in December 2004, and there is no indication Claimant was barely functioning

16

on a day to day basis as suggested by Krippa's report. (R. 30-31, 79, 456).

The ALJ also cited Claimant's self-completed function report from October 2011, which likewise undermines Krippa's finding that Claimant was barely functioning in the period prior to his DLI. (R. 78, 197-204). Claimant suggests the ALJ's reliance on this report is questionable given Claimant's "mental limitations and those he chose to share, or not, with others." Pl.'s Mem. [DE-25] at 8. However, the function report completed by Claimant's father (R. 205-12) closely follows Claimant's own report, and Claimant testified at the administrative hearing that he "spent a lot of time with [his] parents" after moving to North Carolina. (R. 34). The fact that Claimant may have been reluctant to discuss his mental problems with others does not call into question the reporting of his daily activities and abilities to the SSA, particularly where he disclosed in the same report that he was having trouble with mental abilities. (R. 202). Claimant also suggests that his daily activities are no indicator he can work on a regular and continuous basis." Pl.'s Mem. [DE-25] at 8. To the contrary, a claimant's activities of daily living are relevant to his ability to work. *See* S.S.R. 85-16, 1985 WL 56855, at *2 (Jan. 1, 1985) (a claimant's mental RFC is determined by evaluating evidence including "[r]eports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.").

The factually similar case of *Brennan v. Colvin*, No. 13-CV-4866 RRM, 2015 WL 5772087 (E.D.N.Y. Sept. 29, 2015) (unpublished), is also instructive. In *Brennan*, the claimant was a firefighter and a first responder to the World Trade Center on 9/11. *Id.* at *2. In October 2008, it was recommended that the claimant be found permanently unfit for firefighting duty due to asthma, and he was awarded disability retirement on February 25, 2009. *Id.* at *2-3. On June 3, 2009, the claimant applied for SSA benefits, alleging an onset date of February 25, 2009 due to asthma and

17

other physical impairments. *Id.* at *1. The claimant later alleged that he was also disabled due to PTSD and depression stemming from the events of 9/11. *Id.* at *3. Prior to his alleged onset date, the claimant received some informal counseling from the fire department counseling unit but indicated it was not helpful. *Id.* In 2011, the claimant reported that the onset of his depression, anxiety, nightmares, hostility, and many other severe symptoms, was in February 2009, but there was no medical evidence prior to 2011 to confirm this assertion. *Id.*

On October 15, 2011, the claimant was evaluated by a psychologist and reported that after 9/11 he began to drink alcohol to help with sleep due to repeated nightmares, that he had loss of interest in prior activities, decreased energy, fear and anxiety about terrorist attacks, flashbacks, survivor's guilt, and suicidal ideation. *Id.* at *4. The psychologist observed the claimant was "alert and oriented, spoke clearly in an organized fashion, and was focused on a wish to return to work as a firefighter" but also concluded that claimant's "mood was depressed and anxious, his affect was sad, his concentration and attention to detail was fair, his short and long-term memory were fair, and his insight and judgment were fair." *Id.* The claimant was diagnosed with PTSD and the psychologist opined the claimant was "totally disabled emotionally and unable to function in any job in any capacity and that the present degree of severity of his mental illness had existed since February 2009." *Id.* (citations and internal quotation marks omitted). On December 23, 2011, the ALJ determined the claimant was not disabled and in doing so gave the psychologist's opinion little weight because it relied almost exclusively on the claimant's subjective allegations during one office visit. *Id.* at *8-9.

The claimant sought review from the Appeals Council and submitted additional evidence that pre-dated the ALJ's decision, including narrative reports from two psychologists, one of whom the

18

claimant saw three times in September and October 2011 related to his PTSD and the other who conducted a psychiatric examination of the claimant on July 25, 2012. *Id.* at *9-10. The narrative reports were similar to the one considered by the ALJ, reporting the claimant suffered insomnia, nightmares, flashbacks, anxiety, and depression, and that he was incapable of working. *Id.* at *10-11. The Appeals Council declined to even consider the July 25, 2012 report, concluding it was new information about a later time. *Id.* at *11. The claimant argued on appeal that the ALJ erred in according little weight to the October 2011 psychologist's opinion and that the Appeals Council erred by failing to consider the July 2012 psychologist's opinion. *Id.* at *12. The court found no error in either determination. *Id.* at *13-15. With respect to the October 2011 psychologist's opinion, the court noted among other things that the opinion appeared to be "a narrative of plaintiff's self-reported subjective symptoms" and the "observed findings were far less drastic," that the claimant failed to submit any prior psychiatric records that would indicate his PTSD was disabling, that the opinion was inconsistent with the claimant's testimony and other medical evidence of record indicating that the claimant still attended events, socialized with his former co-workers, and had no problems getting along with others, and that the claimant testified he did not want to stop working as a firefighter but had to do so due to his physical problems, making no mention of any impact of his psychological problems on his ability to work as a firefighter. *Id.* at * 13-14. With respect to the July 25, 2012 report, the court determined it was based on the claimant's subjective statements and a review of his treatment history, and was thus cumulative of the other report. *Id.* at *15. The court noted that to the extent the report relied on observations during the examination, it occurred seven months after the ALJ's decision and was not related to the period prior to the ALJ's decision. *Id.*

Here, as in *Brennan*, the ALJ found Krippa's reports were contradicted by evidence in the

19

record, including Claimant's own reports of his functioning in October 2011, as well as the absence of evidence in the record that Claimant suffered from disabling mental impairments while he continued to work as a firefighter until his medical retirement in December 2014, that he was treated for anxiety and depression in November 2010 with medication but reported improvement in December 2010 and did not follow-up with this treatment provider thereafter, and that his recent treatment involved only counseling, which is conservative in nature. (R. 74, 77-79). Additionally, the *Bird* case does not require a different result, where here the ALJ considered Krippa's opinions and did not summarily reject them because she treated Claimant after his DLI, but rather discounted them because they were contradicted by substantial evidence in the record. *See Bird*, 699 F.3d at 342 (holding the ALJ's failure to give retrospective consideration to medical evidence created after the claimant's DLI was an error of law); *Greifenstein v. Colvin*, No. 2:13CV81, 2014 WL 198720, at *4 (E.D. Va. Jan. 15, 2014) (unpublished) ("To read *Bird* to hold that post-DLI medical opinions can, in and of themselves and without any meaningful corroboration by pre-DLI evidence, create an inference of linkage is untenable."). Accordingly, the ALJ did not err in evaluating Krippa's opinions.

## B. The ALJ's Consideration of Listings 12.04 and 12.06

Claimant contends that a finding of disabled under Listings 12.04 and 12.06, related to depression and anxiety, would have been warranted "had the ALJ accepted Ms. Krippa's opinions on the claimant's limitations[.]" Pl.'s Mem. [DE-25] at 8-10. However, as discussed above, the ALJ properly rejected Krippa's opinions because they were contradicted by substantial evidence in the record. *See Jones v. Colvin*, No. CIV.A. 0:13-2574-MGL, 2014 WL 5772058, at *7-8 (D.S.C. Nov. 5, 2014) (unpublished) (finding the claimant failed to demonstrate error in the ALJ's consideration

20

of the listings where the claimant relied on a medical opinion the ALJ had correctly determined was entitled to little weight). To the extent Claimant relies on his own testimony to support his contention that his impairments met or equaled a listing, the ALJ gave Claimant's testimony little weight because it was inconsistent with other evidence in the record (R. 78), and Claimant has not challenged the ALJ's credibility determination in this regard. The ALJ considered the criteria for each of the challenged listings and determined Claimant had failed to establish the necessary requirements. (R. 74-76). Accordingly, Claimant has failed to demonstrate any error in the ALJ's determination that Claimant's mental impairments do not meet or equal Listings 12.04 and 12.06.

## C. The ALJ's Failure to Request a Psychological Assessment

Claimant contends the ALJ erred in failing to obtain a psychological assessment of Claimant to the extent there was a question about the mental health opinions in the record or a conflict in the evidence. Pl.'s Mem. [DE-25] at 10. The ALJ may order a consultative examination to attempt to resolve an inconsistency in the evidence or when the evidence is insufficient to make a disability determination. 20 C.F.R. § 404.1519a(b). The decision to order a consultative examination is within the discretion of the ALJ. *See Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003) (per curiam) (unpublished) ("[T]he ALJ has discretion in deciding whether to order a consultative examination.") (citing 20 C.F.R. § 404.1519a). Here, there was no need for a psychological consultative examination because the record contained sufficient evidence regarding Claimant's mental impairments for the ALJ to reach a decision. *See White v. Colvin*, No. 5:13-CV-00757-RN, 2015 WL 1438747, at *10 (E.D.N.C. Mar. 27, 2015) (unpublished) (concluding a consultative examination was not required because there was substantial evidence in the record for the ALJ to conclude the claimant was not disabled) (citations omitted). The fact that the ALJ discounted

21

Krippa's opinion does require the ALJ to obtain another opinion. *See Clontz v. Astrue*, No. 2:12-CV-00013-FDW, 2013 WL 3899507, at *7 (W.D.N.C. July 29, 2013) (unpublished) (rejecting argument that the ALJ was required to obtain a consultative examination because the ALJ gave only some weight to claimant's treating physicians and to the state agency's non-examining physicians' mental assessments). Claimant's speculation that a consultative examination could have led to a different decision had it supported Krippa's opinion is unconvincing. The ALJ rejected Krippa's opinion as contradicted by substantial evidence in the record and there is no reason to believe a similar opinion would not likewise fail to change the ALJ's determination. *See Brennan*, 2015 WL 5772087, at *15 (finding no error in declining to consider a narrative report by an examining psychologist as cumulative, where the latter report was consistent with an earlier report from another psychologist that had been discounted by the ALJ); *Cosom v. Astrue*, No. 3:11CV294-RJC-DSC, 2012 WL 1898921, at *7 (W.D.N.C. Feb. 23, 2012) (unpublished) (finding no error in the ALJ's failure to obtain a consultative examination and noting the examination would have occurred post-DLI) (citing *Knipple v. Comm'r of Soc. Sec.*, No. 6:08-CV-40-ORL-18DAB, 2009 WL 51317, *4 (M.D. Fla. Jan. 7, 2009) (unpublished) ("there is no indication that a consultative examination which would have had to occur significantly after the date last insured would be of any use at all, let alone be 'necessary' to assist the ALJ.")), *adopted by* 2012 WL 1898918 (W.D.N.C. May 24, 2012). Accordingly, the ALJ did not err in failing to obtain a psychological consultative assessment.

## D. The ALJ's Consideration of Claimant's Moderate Limitation in Concentration

Claimant contends that a limitation to simple, routine, repetitive tasks does not account for his moderate difficulties with concentration. Pl.'s Mem. [DE-25] at 10-11. In *Mascio v. Colvin*, the Fourth Circuit held that "an ALJ does not account 'for a claimant's limitations in concentration,

22

persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" 780 F.3d 632, 638 (4th Cir. 2015) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)). The court explained that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* The court also indicated that there could be instances where a limitation in concentration, persistence, and pace does not affect the Claimant's ability to work and would be appropriately excluded from the hypothetical to the VE and the RFC. *Id.* In such circumstances, however, an explanation from the ALJ is required. *Id.*

Here, the ALJ limited Claimant not only to simple, routine, repetitive tasks, but also imposed the additional limitations of no complex decision making, constant change, dealing with crisis situations, or requiring adherence to a production rate, only occasional interaction with co-workers and supervisors, and no public contact. (R. 76). Such limitations have been found to sufficiently account for moderate limitations in the ability to concentrate. *See Russo v. Astrue*, 421 F. App'x 184, 192 (3d Cir. Apr. 6, 2011) (unpublished) (finding hypothetical including the limitations of "understand, remember, and carry out simple instructions, would have limited contact with the public and coworkers, and would not have a quota to fulfill" accounted for moderate difficulties with concentration, persistence, and pace); *Seamon v. Astrue*, 364 F. App'x 243, 248 (7th Cir. Jan. 29, 2010) (unpublished) ("[T]he ALJ captured [claimant's] moderate limitation in concentration, persistence, and pace when he included a restriction of 'no high production goals.'"); *Weeks v. Colvin*, No. 5:14-CV-155-D, 2015 WL 5242927, at *2 (E.D.N.C. Sept. 8, 2015) (unpublished) (finding limitation "to performing simple, routine, repetitive tasks with only occasional contact with

23

the general public in an environment with few workplace changes" sufficiently accounted for difficulties with concentration and persistence but not pace); *Linares v. Colvin*, No. 5:14-CV-00120, 2015 WL 4389533, at \*4 (W.D.N.C. July 17, 2015) (unpublished) (distinguishing *Mascio* where the ALJ limited claimant to "simple, repetitive, routine tasks in a stable work environment at a nonproduction pace with only occasional public contact," accounting for limitation in concentration and persistence by restricting her to a stable work environment with only occasional public contact and in pace by restricting her to nonproduction pace). Accordingly, the instant case is distinguishable from *Mascio*, and the ALJ sufficiently accounted for Claimant's moderate limitations in concentration.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-24] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-26] be ALLOWED, and the final decision of the Commissioner be upheld.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **February 22, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the

24

objections.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Submitted, this the 8th day of February 2016.

Robert B. Jones, Jr.
United States Magistrate Judge